# In the United States Court of Federal Claims

No. 15-1397C

(Filed Under Seal: March 7, 2016)

(Reissued for Publication: March 15, 2016)

```
*************************************
                                    *
DYNCORP INTERNATIONAL, LLC,         *
                                    *
                    Plaintiff,      *  Pre-award Bid Protest; Failure to
                                    *  Protect   Proprietary   Information;
        v.                          *  Waiver; Reasonableness of Agency's
                                    *  Remedial Action; Judgment on the
THE UNITED STATES,                  *  Administrative Record.
                                    *
                    Defendant.      *
                                    *
*************************************
```

*David M. Nadler*, with whom were *Adam Proujansky*, *David Y. Yang* and *Stephanie M. Zechmann*, Blank Rome LLP, Washington, D.C., for Plaintiff.

*Alexander V. Sverdlov*, with whom were *Benjamin C. Mizer*, Acting Assistant Attorney General, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Beatrice Foster*, Chief, Commercial Law Division, Air Combat Command, U.S. Air Force, Of Counsel, for Defendant.

OPINION AND ORDER[1]

WHEELER, Judge.

Plaintiff DynCorp International, LLC ("DynCorp") filed this pre-award bid protest challenging the U.S. Air Force's decision to continue with a War Reserve Materiel III ("WRM III") solicitation after the Air Force had publicly disclosed DynCorp's proprietary

---

[1] The Court issued this decision under seal on March 7, 2016 and invited the parties to submit proposed redactions of any competitive-sensitive, proprietary, confidential, or other protected information on or before March 14, 2016.  The Government proposed no redactions and Plaintiff DynCorp International, LLC proposed minimal redactions concerning the rate and fee data at issue in this protest.  These redactions are indicated in the decision by brackets and an ellipsis, [. . .].

cost and pricing data.  DynCorp had been the incumbent on the prior WRM I and II contracts, and in the course of performing those contracts, had submitted proprietary indirect cost and profit data to the Air Force as part of life cycle management reports.  By the Air Force's posting of this proprietary data online as part of the new WRM III solicitation, DynCorp contends that the Air Force put DynCorp at a severe competitive disadvantage.  DynCorp says that the only permissible remedy is for the Air Force to extend DynCorp's current contract for five years on a sole source basis.

The record does not support DynCorp's position.  As will be shown, DynCorp consistently failed to mark its indirect cost and profit data as "proprietary," and did not even object when the Air Force inquired whether the life cycle management reports could be posted as part of the new solicitation.  DynCorp thereby waived its right to assert that the data was "proprietary," and the Air Force did nothing wrong by disclosing the data as part of the new solicitation.  Moreover, the Air Force's actions to mitigate the effects of disclosure on DynCorp's competitive position were reasonable.  Accordingly, DynCorp's protest is DENIED, and the Court GRANTS Defendant's motion for judgment on the administrative record.

I.     Factual Background[2]

For the past sixteen years, DynCorp has served as the prime contractor for the WRM program, through the initial WRM I contract and a successor contract, WRM II.  Pl. Mem. at 3.  The United States Air Force Air Combat Command Acquisition Management and Integration Center ("AMIC") runs the WRM program and conducts the WRM procurements.  Gov't Mem. at 2.  Among other responsibilities, the AMIC must manage and maintain stockpiles of war reserve materiel and other government equipment.  Id.  To accomplish this mission, AMIC employs private contractors to manage its equipment warehouses.  Under the WRM program, contractors are responsible for a number of critical tasks, such as "storage, maintenance, outload, reconstitution, exercise and contingency logistics supports, as well as maintenance, repair, and minor construction of government furnished facilities and property."  Pl. Mem. at 3;  Administrative Record ("AR") 1128.

A.  Life Cycle Management Deliverables

On March 9, 2015, the Air Force posted the initial draft WRM III solicitation to FedBizOpps.gov, which was followed by the final solicitation (No. FA4890-15-R-0004) on July 24, 2015.  AR 1, 143.  Along with a detailed description of what the Air Force would require from the awardee in terms of maintaining and repairing Government-owned

---

[2]  The facts in this decision are taken from the administrative record, as supplemented.  The pages in the administrative record are numbered in sequence, and the documents are divided by tabs.  The Court's citations to the administrative record generally are to the page numbers, and to the declarations that the Court admitted as supplements to the administrative record.

equipment, the WRM III solicitation also included examples of the deliverables the eventual awardee would be responsible for providing to the Air Force over the course of the contract. See AR 1128, 292-93, 382-85. Among other things, these deliverables included a life cycle management plan. The life cycle management plan requires the contractor to submit an annual report including the contractor's budget forecast and replacement recommendations for items reaching the end of their life cycle in the following year. AR 1129. The life cycle management plan is part of a comprehensive life cycle approach "to maintaining and enhancing the life of all GFP/E/V/F [government furnished property, equipment, vehicles, and facilities] . . . ." Id.

Under the WRM II contract, DynCorp had been submitting life cycle report spreadsheets to the Air Force since at least 2012. Declaration of Everton Chapman ("Chapman Decl.") ¶ 5. These reports "identified the date on which the Government purchased certain tools (such as pressure washers, wrenches, battery chargers. . . ), how much the Government paid for those tools at the time they were purchased, and the projected date and cost when the Air Force would have to buy replacements." Gov't Mem. at 3; AR 704. Most importantly for purposes of the present protest, these spreadsheets also included DynCorp's indirect rate and award fee data, information that Plaintiff maintains "is highly confidential and proprietary" as it relates to DynCorp's "performance and cost structure under the incumbent WRM II program." Pl. Mem. at 7-8. For instance, on July 31, 2012, DynCorp representative Steve Trotter sent Everton Chapman, an Air Force contract logistics manager, a life cycle report that "included blocks containing an 'Indirect' [. . .] rate and a 'Fee' of [. . .]." Chapman Decl. ¶ 5. According to Mr. Chapman, the report contained no proprietary markings and "Mr. Trotter did not indicate that any of the information in the report was protected" in transmitting the report. Id. Likewise, Joe Fyffe, DynCorp's WRM II Program Property Manager, regularly submitted similar reports to Mr. Chapman without any indication that they contained proprietary information. See, e.g., Chapman Decl., Attachment B.

Pursuant to the WRM II contract between DynCorp and the Air Force, the Government expressly acquired "unlimited rights to all deliverables procured under [the] contract," with unlimited rights defined as "rights to use, modify, reproduce, perform, display, release, or disclose in whole or in part, in any manner, and for any purposes whatsoever, and to authorize others to do so," and deliverables defined as "the documents, regardless of media format (e.g. print or electronic), identified in the PWS [Performance Work Statement], and described in the PWS Appendix B, Deliverables." AR 1342. To guard against the possibility that proprietary information submitted in deliverables might be shared or released, the WRM II contract included the following paragraph explaining how to flag proprietary deliverables:

> All deliverables are Government owned property upon submittal. Should any deliverable contain proprietary info/data, said info/data shall be clearly identified by *italics* and shall be clearly annotated with the word

> "PROPRIETARY" in brackets, i.e. [PROPRIETARY] immediately prior to and immediately following the proprietary info/data. All deliverables shall contain a summary page cross-referencing proprietary info/data by page number and paragraph and shall contain a specific rationale as to why the info/data is considered proprietary.

AR 1345. In addition to these two contract provisions, the WRM II contract also incorporated by reference sections of the Federal Acquisition Regulation ("FAR") and Defense Federal Acquisition Regulation Supplement ("DFARS") defining the Government's right to contractor-furnished data. See, e.g., AR 1346-48 (WRM II contract incorporating by reference FAR § 52.227-14 and DFARS §§ 252.227-7013 and 7016).

In his role as Logistics Manager for the WRM II contract and Chief of the Materiel Management Branch of the AMIC, Mr. Chapman assisted in developing the WRM III solicitation. Based on his experience with the WRM II contract, Mr. Chapman decided that the eventual awardee of the WRM III should also be required to deliver life cycle reports on Government-furnished equipment. Chapman Decl. ¶ 7. As an example of the type of deliverables prospective offerors would be required to produce, Mr. Chapman wanted to include a version of DynCorp's life cycle reports as part of the solicitation's performance work statement. Id. Accordingly, Mr. Chapman contacted Mr. Fyffe via e-mail in early 2015, asking for "a current Life Cycle" and explaining that he "planned on using the March submittal to post to the new contract." Chapman Decl., Attachment C (email exchange between Mr. Chapman and Mr. Fyffe). On February 6, 2015, Mr. Fyffe replied to Mr. Chapman's request and included as an e-mail attachment life cycle reports for various Government-furnished equipment. Id. As with previous submitted life cycle reports, the February 6 report included DynCorp's rate and fee data but contained no proprietary markings. Chapman Decl. ¶ 8. According to Mr. Chapman, in their e-mail exchange, Mr. Fyffe gave no indication of "any objections to the updated report being released." Id. As ultimately posted to FedBizOpps.gov, the WRM III solicitation included a copy of the 2012 life cycle spreadsheet submitted by Mr. Trotter. Id. ¶ 9. According to Mr. Chapman, the 2012 "spreadsheet does not contain any data that Mr. Trotter, Mr. Fyffe, or any other DynCorp representative, ever told [him] was proprietary or should be protected. To the contrary, the document contains the same rates that Mr. Fyffe released to [him] without restriction in other reports." Id.

B.  Disclosure and Mitigation Efforts

On August 5, 2015, Vectrus Systems Corporation ("Vectrus"), a prospective offeror, contacted the Air Force after one of its employees alerted the Vectrus legal department that the WRM III solicitation included "material that the company believes may contain proprietary information from the incumbent contractor." AR 1225. At that point, the life cycle management list had been available to the public through the FedBizOpps website for more than five months. After verifying that DynCorp's profit and

pricing data were in fact publicly available on the FedBizOpps website, the agency removed the solicitation and notified its legal department.  Pl. Mem. at 12; AR 1220, 1225. On August 6, 2015, Contracting Officer Sheila Reshard-Bryant corresponded with Gregory Passig at Vectrus to ensure that all copies of the life cycle report would be destroyed.  AR 1220.  In a letter dated August 19, 2015, Vectrus's Deputy General Counsel of Government Contracts, Tim Kobes, explained that only Vectrus's Business Development Manager had actually viewed the pricing information and confirmed that the company had deleted all known copies of the file.  AR 1225-26.

Also on August 6, Ms. Reshard-Bryant and another agency contracting officer contacted Robert Caldwell, Senior Contracts Director at DynCorp, and identified the information that had been posted publicly and the steps the agency was taking in response, namely, sanitizing the documents and reposting the solicitation.  AR 1220.  Initially, Mr. Caldwell indicated that he "didn't find it to be a big deal."  Id.  However, upon further investigation and consideration of the specific information released, Mr. Caldwell developed "serious concerns about the disclosure."  Id.; Declaration of Robert Caldwell ("Caldwell Decl.") ¶ 8.  In a letter to the Air Force dated August 17, 2015, Mr. Caldwell described DynCorp's concerns as follows:

> The disclosure of DI's indirect rate and fee on its incumbent contract allows DI's competitors to create a competitive target of [. . .] over direct cost to include all corporate indirect rates and profit. . . . Its 16 year performance as the incumbent contractor has allowed DI to develop rates and fees that competitors with less or no experience would doubtless seek to emulate and undercut.  It is patently unfair for DI's competitors . . . to benefit from DI's 16 years of experience. . . . [W]ith the disclosure of this information, our competitors on this solicitation, and other contracts, will now be able to utilize the disclosed information as a baseline from which to determine their own rates and fees.

AR 1212-13.  To remedy the alleged harm caused by the Air Force's disclosure, DynCorp requested nothing less than the cancellation of the WRM III solicitation coupled with a five-year extension of its current WRM II contract.[3]  AR 1213.  On August 27, 2015, the Air Force sent DynCorp a letter responding to the contractor's concerns.  AR 1229-31.  The Air Force maintained that the steps it had taken to mitigate any competitive harm to DynCorp were sufficient and, accordingly, denied DynCorp's request to cancel the solicitation and extend the WRM II contract through a sole-source extension.  AR 1229. The Air Force also noted that (1) the [. . .] award fee was not relevant to the WRM III solicitation as the Air Force was not requiring offerors to submit proposed award fee

---

[3] According to Mr. Caldwell, it would take five years to negate any "Price Forwarding Rate" damage resulting from the information's release.  AR 1223.

percentages, and (2) through Amendment 0001, the Air Force removed the ability of offerors to propose indirect rates by providing fixed figures and requiring offerors to substitute those figures in their proposal calculations.  AR 1230.

### C. Current Protest

Unsatisfied with the Air Force's mitigation response, DynCorp filed a protest with the U.S. Government Accountability Office ("GAO") on October 9, 2015.  In its protest before the GAO, DynCorp again sought to have the WRM III solicitation cancelled and requested that the GAO recommend it be issued a five-year sole-source extension for the contract. AR 1245.  Finding that DynCorp's protest was not timely filed, the GAO declined to consider the merits of the protest.  AR 1250.  DynCorp then filed a pre-award bid protest with this Court on November 18, 2015.  The motion for a preliminary injunction that accompanied DynCorp's complaint was rendered moot by the Air Force's voluntary stay of the solicitation.  The parties have fully briefed their respective motions for judgment on the administrative record, and the Court heard oral argument on February 9, 2016.

## II.   Discussion

### A. Jurisdiction and Standing

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, this Court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Determining whether a bid protester has standing to pursue a claim in this Court "is a threshold jurisdictional issue" that must be met in any protest.  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-04 (1998)).  To establish standing under the Tucker Act, an aggrieved protester must demonstrate that it is an "interested party" by showing that it is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2) (Supp. IV 1998)).  DynCorp, as the incumbent offeror, timely submitted a compliant proposal in response to the WRM III solicitation.  Thus, the Government does not dispute, and the Court agrees, that DynCorp has standing to bring this action as an interested party.

### B. Standard of Review

In a bid protest, this Court reviews an agency's decision pursuant to the standards set forth in the Administrative Procedure Act ("APA").  5 U.S.C. §§ 701-706 (2000); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332

(Fed. Cir. 2001) (stating that the APA standard of review shall apply in all procurement protests in the Court of Federal Claims).  Under the APA, a reviewing court shall set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see, e.g., Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004).  This standard of review is "a narrow one."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (citations omitted).

Under the APA standard, this Court must sustain an agency official's decision unless that decision lacked a rational basis or the agency's decision-making involved a violation of regulation or procedure.  Impresa, 238 F.3d at 1333.  When evaluating a challenge on the first ground, a court "must determine 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'"  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting Impresa, 238 F.3d at 1332–33 (Fed. Cir. 2001)).

C. Waiver

DynCorp asks the Court to find that the Air Force caused it competitive harm by disclosing its indirect rate and fee data and that its decision to proceed with the WRM III solicitation after the disclosure was unreasonable.  Compl. ¶¶ 5-7.  Additionally, DynCorp claims that the Air Force's decision to continue with the procurement violates sections 1.602-2(b) and 3.101-1 of the FAR, the Procurement Integrity Act ("PIA"), 41 U.S.C. § 423 et seq., and the Government's implied-in-fact contract obligations to DynCorp as a "bidder-claimant."  Compl. ¶¶ 53-71 ("The government is said to breach [an] implied in fact contract if its consideration of offers is found to be arbitrary and capricious toward the bidder-claimant.") (citing Southfork Systems, Inc. v. United States, 141 F.3d 1124, 1132 (Fed. Cir. 1998) (quotations and citation omitted).  DynCorp believes that the Air Force's mitigation efforts after discovering the disclosure were inadequate and insists that the only acceptable solution is for the Air Force to issue a sole source award of the WRM III contract to DynCorp.  Compl. ¶ 7.

The Government argues that, assuming the information it released was proprietary, the Air Force reasonably found that it sufficiently mitigated any competitive harm that could have resulted from the release.  However, the Government maintains that this protest can be decided on the issue of waiver.  Namely, the Government argues that DynCorp waived any protections or rights to relief it may have had when it repeatedly and consistently failed to treat its data as proprietary.  See Gov't Reply at 2-7.  According to the Government, the central flaw in this protest is that DynCorp attempts to fault the Air Force for releasing data "that DynCorp itself did not treat as confidential, and which therefore cannot be entitled to protection as a matter of law."  Gov't Reply at 1.  When considering a motion for judgment on the administrative record, this Court must determine

whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)). Based on the record before the Court in this protest, the Court is of the opinion that DynCorp has failed to show it took the necessary measures to mark or otherwise protect its data, resulting in a waiver of the various protections from disclosure it seeks to invoke here.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). To be effective, a waiver "must be a voluntary, knowing and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." Am. Airlines, Inc. v. United States, 77 Fed. Cl. 672, 681 (2007) (quotations and citations omitted). "Waiver requires only that the party waiving such right do so 'voluntarily' and 'knowingly' based on the facts of the case." Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (1990) (citing Brookhart v. Janis, 384 U.S. 1, 4, 5 (1966)). Although a waiver must be voluntary and knowing, it "need not be express, but may be inferred from a pattern of conduct." Am. Airlines, Inc., 77 Fed. Cl. at 681; see also, Seaboard Lumber Co., 903 F.2d at 1563 ("Waiver can be either express or implied." (citations omitted)).

This Court has held that a contractor's failure to properly mark deliverable data with the appropriate restrictive indicators will result in the government gaining full use of that data. Night Vision Corp. v. United States, 68 Fed. Cl. 368, 380 (2005) (explaining that "[a] failure to use the appropriate legend results in the government receiving complete, unrestricted use."). Similarly, "sections of the FAR which limit the government's rights in proprietary data developed by contractors have consistently been interpreted in this vein." Id.; accord Ervin & Assocs., Inc. v. United States, 59 Fed. Cl. 267 (2004) (holding that the government obtained unlimited data rights when the contractor failed to mark delivered data with a "Limited Rights Notice" as prescribed in 48 C.F.R. § 52.227-14). A restrictive marking or legend "alert[s] all government officials—even those unfamiliar with the data rights of the contractor—that data is considered proprietary and is inappropriate for dissemination. . . . The least cost burden in such instances rests with the contractor, who can easily apply an appropriate legend to the proprietary data." Night Vision Corp., 68 Fed. Cl. at 381. Accordingly, by failing to appropriately identify data a contractor considers proprietary, a contractor who has both the knowledge and ability to do so can forfeit its right to claim that data should be subject to protection.

Pursuant to the WRM II contract between DynCorp and the Air Force, the government expressly acquired "unlimited rights to all deliverables procured under [the] contract." AR 1342. Certainly, as the Government acknowledges, this language did not authorize the Air Force to release proprietary data. In fact, to guard against such a possibility, the WRM II contract included a section dedicated to explaining how to flag proprietary deliverables. AR 1345. Thus, as the Government explains, "[t]he point is not that the WRM II contract permitted the Government to release DynCorp's proprietary

information.  It did not.  Rather, the point is that the contract provided DynCorp *notice* that unrestricted reports could be released publicly (and detailed the ways in which confidential data should be marked)."  Gov't Reply at 4 (emphasis in original).  In light of this notice, the fact that DynCorp officials (1) consistently failed to flag the life cycle management reports as proprietary over a period of years, (2) raised no objections when informed that the Air Force planned to include these reports in the WRM III solicitation, and (3) failed to object to the inclusion of those reports for more than five months after the they were made publicly available on FedBizOpps.gov—in the very solicitation upon which DynCorp was bidding—creates a pattern of consistent action that effectively gives rise to the implication that DynCorp knowingly waived protection for its information.  See, e.g., Am. Airlines, Inc., 77 Fed. Cl. at 680 (noting that a party's knowing and deliberate waiver of a right "may be inferred from a pattern of conduct").  As the party with the least cost burden and greater understanding of its own data, it was up to DynCorp to properly mark any proprietary information it delivered to the Air Force.  DynCorp may not now come before this Court seeking legal protection from disclosure of data rights it consistently failed to assert.

Finally, DynCorp insists that the Air Force's decision to remove and sanitize the solicitation and to require sworn statements from offerors affirming that they destroyed any copies "demonstrate a high degree of concern regarding the Agency's improper disclosure of proprietary information."  Pl. Reply at 3.  The Court is not convinced that the Air Force's decision to remove the solicitation and clear the rate and fee data after it was contacted by a concerned offeror is tantamount to an admission of wrongdoing on the agency's part.  As the Government has explained, "[i]n its discussions with DynCorp and the resulting administrative proceedings, the Air Force did not conduct a detailed analysis of whether the data at issue is, in fact, protected—rather, the Air Force *assumed* that it was, and focused on devising the most appropriate means to remedy the harm to DynCorp."  Gov't Mot. to Supplement at 4 (emphasis in original) (citing AR 1229-31 (Contracting Officer's final decision about appropriate remedial action)).  The Court finds the Air Force's chosen course of conduct reasonable in light of the information it had at the time and refuses to interpret its precautionary remedial measures as an admission of fault.

D. Reasonableness

In addition to finding that DynCorp waived any right to claim that its fee and award data should have been protected, the Court finds that the Air Force's mitigation efforts were a reasonable solution to the apparent problem presented by the release of the data.  As published on FedBizOpps.gov, the life cycle management spreadsheet included DynCorp's indirect rate and award fee data from its WRM II contract.  To remove the possibility that DynCorp's competitors could benefit from access to the indirect rate, the Air Force issued an amendment that required offerors to use fixed "plug" figures, rather than a proposed rate, in their calculations, thereby removing the competitive variable from that portion of the solicitation.  AR 1230; AR 838-70 (Amendment 0001).  As to the award fee, the Air Force determined that offerors would not gain a competitive advantage from access to that

information because the WRM III solicitation stipulates a set fee and therefore offerors were not asked to submit proposed award fee percentages, as they had been for the WRM II solicitation.  AR 1230.  DynCorp's additional contentions that its competitors may be able to gain a competitive advantage by applying the indirect rate to other contract line item numbers are speculative and implausible.  Given the information available to the Air Force and subsequently presented to this Court, the Court agrees that the agency's remediation efforts were reasonable and that its decision to proceed with the procurement in light of those efforts also was reasonable.

III.    Conclusion

Based upon the foregoing, the Court DISMISSES DynCorp's claims as barred by the doctrine of waiver, and GRANTS the Government's Motion for Judgment on the Administrative Record.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge